IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LESLIE BURNEY,

  **Petitioner,**       **CASE NO. 2:09-cv-731**
             **JUDGE SMITH**
**v.**            **MAGISTRATE JUDGE KEMP**

WARDEN, ROSS CORRECTIONAL
INSTITUTION,

  **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, respondent's Return of Writ, and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## I. PROCEDURAL HISTORY

The procedural history of this case is summarized as follows.  On April 20, 2006, petitioner was indicted by a Franklin County Grand Jury for attempted murder with two firearm specifications and felonious assault with two firearm specifications.  *Exhibit 1 to Return of Writ*.  On August 29, 2006, a jury returned a verdict finding petitioner guilty of felonious assault and a three-year firearm specification.  *Exhibit 2 to Return of Writ*. Petitioner was sentenced to four years in prison on the felonious assault charge in addition to the three-year firearm specification.  *Id*.

On September 29, 2006, Petitioner, represented by the Franklin County Public Defender, filed a notice of appeal to the Franklin County Court of Appeals.  He raised

the following issues:

> 1.  The trial court erred in permitting the state to use a prior statement from a non-testifying co-defendant to rebut appellant's alibi.

> 2.  Appellant was denied effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution because counsel failed to timely object to the introduction of admissible evidence that was highly damaging and unfairly prejudicial.

> 3.  Appellant was denied his right to a fair trial because of prosecutorial misconduct.

> 4.  The guilty verdicts were against the manifest weight of the evidence, thereby depriving Appellant of his due process protections under the state and federal Constitutions.

*Exhibit 4 to Return of Writ.*

On December 31, 2007, the Court of Appeals issued a decision affirming the judgment of the trial court. *Exhibit 6 to Return of Writ.* One judge dissented. *Id.*

On February 8, 2008, petitioner, again with the assistance of the public defender, filed a timely appeal to the Ohio Supreme Court. *Exhibit 8 to Return of Writ.* He asserted the following propositions of law:

> 1.  Violations of the confrontation clauses under the state and federal Constitutions require reversal unless harmless beyond a reasonable doubt. This standard requires at the very least that the prosecution's evidence without the offending testimony must be so strong that no reasonable juror or jury could reasonably find the defendant to be not guilty.

> 2.  A criminal defense counsel commits a substantial
> violation of essential duties by failing to timely object
> to the introduction of inadmissible other act evidence.
> A client who is prejudiced by counsel's ineffectiveness
> is denied the effective assistance of counsel as guaranteed
> under the Fifth, Sixth, and Fourteenth Amendments to the
> United States Constitution and Article I, Section 10 of the
> Ohio Constitution.
>
> 3.  A statement by the prosecution during closing argument
> that accuses the defendant of uncharged and unproved bad
> acts constitutes prosecutorial misconduct and violates the due
> process clauses under the state and federal Constitutions.

*Id*.  On May 21, 2008, the Ohio Supreme Court declined jurisdiction and dismissed the case

as not involving any substantial constitutional question.  *Exhibit 10 to Return of Writ*.

On August 18, 2009, petitioner, still represented by the Ohio Public Defender, filed

the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that

he is in the custody of the respondent in violation of the Constitution of the United States

based upon the following grounds raised on the face of the petition:

> GROUND ONE: The trial court violated Mr. Burney's right
> to confront the witnesses against him when it admitted into
> evidence the inculpatory statements of Mr. Burney's non-
> testifying codefendant, in violation of the Sixth and
> Fourteenth Amendments to the United States Constitution.
>
> GROUND TWO: Mr. Burney's trail counsel rendered
> ineffective assistance of counsel when he failed to timely
> object to the admission of prejudicial, inadmissible
> evidence at Mr. Burney's trial, in violation of the Sixth
> and Fourteenth Amendments to the Untied States
> Constitution.
>
> GROUND THREE: The prosecutor's misconduct at Mr. Burney's
> trial denied Mr. Burney a fair trial and due process, in violation of

3

the Sixth and Fourteenth Amendments to the United States
Constitution.

It is the position of the respondent that petitioner's claims fail on their merits. For

the following reasons, the Court agrees.

## II. THE FACTS

The facts of this case, as explained by the Tenth District Court of Appeals, are as

follows:

> {¶ 2} The Franklin County Grand Jury indicted appellant on one count of: (1)
> attempted murder with firearm specifications, in violation of R.C. 2923.02,
> 2903.02, 2941.141, and 2941.145; (2) felonious assault with firearm specifications,
> in violation of R.C. 2903.11, 2941.141, and 2941.145. The charges stemmed from
> an April 7, 2006 shooting incident involving victim Mohammad Anwar, a worker
> at the Two Friends store, and appellant's alleged accomplices Ravon Ingram and
> juvenile B.H.

> {¶ 3} Appellant and Ingram pled not guilty to the charges and their cases were
> tried together to a jury. Initially, the trial court, pursuant to a motion by
> plaintiff-appellee, the State of Ohio, dismissed the one-year-prison-term firearm
> specifications that attached to the attempted murder and felonious assault
> charges. Thus, only the three-year-prison-term firearm specifications remained
> on the charges.

> {¶ 4} During opening statements, appellee discussed an altercation between
> appellant and Anwar on April 7, 2006, which took place before the shooting
> incident. Appellee stated the following. On April 7, 2006, a tall person, an
> individual later identified as appellant, tried to grab the cash register at the Two
> Friends store. Anwar called the police. Next:

> The police did show[ ]up * * *. Mr. Anwar explained to them what was going on.
> You will hear Mr. Anwar explain that there was another one with the tall one,
> who is not involved in this case today. His name is Delshawn Jones.

> He was yelling at Mr. Anwar to let him go, let him go. I will shoot you if you
> don't let him go.

4

I anticipate the evidence to show that the man did have a firearm that day and was arrested for the offense of carrying a concealed weapon. The police took his report, and they let the tall one go home after taking a report, and arrested the other one for having a firearm.

Mr. Anwar explained that later on that same day the tall one, and two of his friends that he had seen all together before, who he does not know their names, came back to his store. At this time they were throwing rocks at his windows.

He called the police again. They ran off. And the police took a report, but they don't have the names of these individuals. The police working in the area had a good idea who they were based on the physical description given by Mr. Anwar, but they didn't know for sure and they [took] a report.

So, now we have had two incidents involving Mr. Anwar * * * and a group of neighborhood kids. And one of them has been arrested.

They also had the police called on them a second time for throwing rocks at his business.

(Tr. at 15-16.)

{¶ 5} During opening statements, appellant's counsel argued:

 There is no doubt that Mr. Anwar will identify my client and identify Ravon Ingram. I don't have any doubt he will sit up here and point them out. He did the same in the lineup.

I think, folks, what you need to consider in this case is, in part, the history of the case and all of the circumstances involved. Those are very important. They will be very important in this case.

(Tr. at 23.)

{¶ 6} Next, during opening statements, appellant's counsel informed the jury:

* * * [B.H.], the person that [appellee] described with the big hair, at about 5:55 p.m. that same date, came and smashed what he believed to be Mr. Anwar's car windows in his car with a brick. That was approximately an hour and ten minutes after this earlier incident. And this was [B.H.] and no one else.

5

(Tr. at 23-24.)

{¶ 7} Thereafter, appellant's counsel stated during opening argument:

Also, the state will make an issue-or I expect them to-that Mr. Anwar is certain and confident that these are the people. He made a quick identification in this lineup. There [are] six pictures in this lineup each. One has Leslie Burney in it and one has got Mr. Ingram in it. He makes them quick.

The evidence will show he doesn't know the other people on the lineup. He knows those two individuals. Of course he is going to pick them out very quickly. He knows them from being in the store. * * *

(Tr. at 32.)

{¶ 8} Subsequently, Columbus Police Officer Oscar Polta testified as follows on behalf of appellee. On April 7, 2006, Officer Polta came to the Two Friends store after an altercation involving Anwar. Police were chasing Delshawn Jones, an individual involved in the altercation, for a firearm violation, and police were looking for the firearm that Jones possessed after Jones tossed it away. B.H. taunted and distracted police while police tried to find the firearm. Officer Polta cited B.H. for a bicycle violation and for "pedestrian in the roadway." (Tr. at 184.)

{¶ 9} After that incident, Officer Polta came to the Two Friends store to investigate someone smashing windows of a truck belonging to a worker at the Two Friends store. No one was arrested for the incident. Officer Polta then returned to the Two Friends store after the shooting incident. Officer Polta spoke with Anwar, who did not speak English well, and the officer learned that "the person that had smashed * * * the windows of the car * * * was that same person that shot him." (Tr. at 186.) The conversation lasted less than five minutes, and Officer Polta had other duties he needed to perform at the crime scene, such as securing the area and making sure the victim received medical attention.

{¶ 10} On cross-examination, Officer Polta clarified:

* * * I was led to believe by the victim that the person that had smashed out his truck window, who he had basically stated was [B .H.] was the one that had shot him.

(Tr. at 198.)

6

{¶ 11} On re-cross examination, Officer Polta testified that, at 7:37 p.m. after the shooting incident, police aired a report indicating that B.H. was a suspect. On further re-cross examination, Officer Polta testified to the following. At 8:29 p.m. after the shooting incident, police aired that they were looking for two additional suspects. This second report indicated that one suspect used a metal rod during the incident and was a male black who was five feet eleven inches tall and weighed 145 pounds. The second report also indicated that one shooter was a male black with a small afro, and the other shooter was a male black with a big afro, who was six feet tall and weighed 200 pounds.

{¶ 12} Detective Timothy Dorn testified as follows on behalf of appellee. On April 7, 2006, Detective Dorn interviewed Anwar at a hospital. Detective Dorn showed Anwar a photo array with B.H.'s photograph in it. Anwar identified B.H. as the individual that struck him with a metal bar during the April 7, 2006 shooting incident. Anwar did not indicate to Detective Dorn that B.H. shot him.

{¶ 13} Detective Dorn further testified that the interview was in "broken English." (Tr. at 223.) However, according to Detective Dorn, Anwar seemed "calm" and "coherent" with "[n]o acute distress" at the hospital. (Tr. at 229-230.) However, Detective Dorn also testified that he would anticipate that somebody would have trouble communicating after just having been shot twice and beaten with a metal bar.

{¶ 14} Next, Anwar testified to the following on behalf of appellee with the aid of a sworn interpreter. Anwar worked at the Two Friends store on April 7, 2006. That day, appellant, whom Anwar also referred to as the "tall one," came into the store and tried to grab the cash register. (Tr. at 112.) Another individual, who was neither appellant nor Ingram, threatened to shoot Anwar. Anwar detained appellant and called the police. The police came and briefly detained appellant. The individual who threatened to shoot Anwar fled the scene. The police took a report of the incident and released appellant.

{¶ 15} Anwar then testified as follows:

THE INTERPRETER: Two weeks ago they broke my car windshield.

Q. They broke your car's windshield?

THE INTERPRETER: yes.

Q. That day did the owner's girlfriend's car windows get broken?

7

THE INTERPRETER: In the morning when he open the store. They broke his car windshield in the morning.

* * *

Q. But you don't know who did that?

THE INTERPRETER: No.

* * *

Q. Did anyone come and throw anything at the store?

THE INTERPRETER: They have been throwing stones[.]

Q. Where?

THE INTERPRETER: At my windows.

Q. Did you see who was doing that?

THE INTERPRETER: I cannot see outside, but they were throwing stones at my window.

(Tr. at 116-117.)

{¶ 16} Anwar then described the April 7, 2006 shooting:

* * * Some small kid came in, and somebody hold the door from outside. And they open the door, but nobody came in. And I am looking at the door. The door is beeping and nobody is coming in. I try to close the door. And the guy standing, he hit me with the bar. And the other two shoot, the other two fired at me.

(Tr. at 118.)

{¶ 17} Anwar reiterated that the shooting occurred "[r]ight away after getting hit with the bar." (Tr. at 120.) Anwar testified that the man who hit him with the bar "had big hair." (Tr. at 118.) Anwar also testified that he "definitely" had "a good look" at the shooters' faces, and Anwar stated that the shooters came to the Two

8

Friends store every day. (Tr. at 121.) Anwar also testified to the following:

Q. * * * [W]ere you able to pick out the two people that shot you from [the photo arrays]?

THE INTERPRETER: Definitely. I know them. I recognize them. They are sitting here.

Q. Are they in pictures in [the photo arrays]?

THE INTERPRETER: Yes.

Q. Did you put marks on there and tell the detective you saw them?

THE INTERPRETER: Yes, definitely[.]

Q. When you picked out their pictures, were you sure those were the two men that shot you?

THE INTERPRETER: Yes, definitely. They were coming to my store for four or five months.

Q. Do you see them in the courtroom here today?

THE INTERPRETER: Yes. They both are sitting here.

Q. Can you point to them, please?

THE INTERPRETER: They are sitting in the middle.

* * *

THE COURT: The record should so reflect that the witness has identified the two defendants.

(Tr. at 134-136.)

{¶ 18} On cross-examination, Anwar denied telling police after the shooting incident that "the guy with big hair," i.e., B.H., shot him. (Tr. at 161.) Anwar also denied telling Officer Polta that the individual who shot him was the one who previously broke his truck window, i.e., B.H.

9

{¶ 19} Detective Siniff also testified as follows on behalf of appellee. On April 12, 2006, Detective Siniff interviewed Anwar at police headquarters about the April 7, 2006 shooting. Detective Siniff obtained an interpreter from an interpreter service. Through the translator, Anwar identified appellant and Ingram in the photo arrays. Anwar did not have any difficulty in identifying appellant or Ingram from the photo array. Indeed, Anwar immediately picked appellant from the photo arrays. Appellee admitted into evidence the photo arrays, which do not depict appellant or Ingram as having large afros.

{¶ 20} On cross-examination, Detective Siniff testified as follows:

Q [Appellant's trial counsel]. Do you remember [there] being two different versions of who shot Mr. Anwar?

* * *

[A.] Officer Polta handed me the report. I glanced over it, yes. * * *

* * *

Q. Did you ever talk to Officer Polta about the discrepancy in his report?

A. No.

Q. But if there was one, you would have wanted to talk to him about any such discrepancy?

A. Once Mr. Anwar had made his * * * positive ID, I was not concerned with those. * * * [A] lot of times descriptions get confused, they get relayed wrong.

Q. So, you weren't concerned?

A. Not at that time, no.

(Tr. at 324-325.)

{¶ 21} Detective Siniff also testified on cross-examination that she did not ask Anwar about weather conditions, his stress level, the lighting, the length of the incident, how long he viewed the shooters or whether his attention was diverted. Detective Siniff did acknowledge, however, that such factors were important.

10

{¶ 22} Appellee then played for the jury the video-recorded interview between Detective Siniff and Anwar. Again, the recording depicted Anwar identifying in the photo arrays Ingram and appellant as the individuals who shot him on April 7, 2006.

{¶ 23} Thereafter, appellee indicated that it was finished presenting evidence, but before appellee formally rested its case-in-chief, Ingram's counsel asserted the following:

* * * [I]t has come to our attention this morning that there has been a DVD of an interview of [Ingram] that was taken when he was arrested. At the time this case was going through the discovery process, we were aware of a summary statement from Detective Siniff that indicated that [Ingram] had told detectives he had been at the business earlier, but knew nothing of the shooting incident. And there was nothing more about that interview.

Yesterday, I believe, I was provided a summary of Detective Dorn's actual interview. And it is a rather lengthy summary. However, in it again [Ingram] puts himself at the store earlier, but indicates that he did not return to the store. And that neither [B.H.] or [appellant] or [Ingram] returned to the store after that incident.

Now, this morning there is a DVD in which [Ingram] states that he and [appellant] were together all night. That [B.H.] was there.

Your Honor, we are going to make a motion in limine that any mention of this interview with [Ingram] be excluded from evidence, first of all, for discovery reasons. I believe we were given it yesterday for the first time. I don't think there is any bad faith or bad doing on [appellee's] part. It is indicated on the front page of the discovery that it was available. However, we were not privy to it until yesterday. We viewed it this morning once.

That, perhaps, would have changed the whole dynamic of our defense, and certainly some of the theories of our defense, had we known about it earlier.

Secondly, your Honor, it is my understanding that [appellee] is going to use this statement that [Ingram] made to Detective Dorn to try and impeach an alibi witness that is going to be called on behalf of [appellant].

* * *

11

* * I don't see any way in Bruton that the court can allow that to happen. * * *

(Tr. at 344-346.)

{¶ 24} Appellee responded:

Discovery was requested. My policy is to have my internist copy everything in the file and provide it to defense counsel.

* * *
* * *

* * * [W]e list [appellant] and [Ingram]. We referenced their interviews. And it says clearly on page 2 of that, the very last sentence, please see attached DVD of the defendant's interview.

Then I reviewed that and signed that, and these interviews are now on DVD. * * * We have our interns copy and provide them with discovery * * *.

* * *

Now, I know things get missed sometimes. But certainly if you don't have a copy of your defendant's statement on the DVD, which we told them about on May 23rd, and we indicated we gave it to them on May 23rd, it is clearly in there. They are on notice it is there.

If they did not receive a copy, all they need to do is either make a phone call to me or make a motion with the court.

The first time I was aware that they had not actually ever received the DVD of either defendant's interview was yesterday around noon.

* * *

I have reviewed that DVD. And I do intend to use it to cross-examine Tiffany Davis * * *.

* * *

We put them on notice when we provided discovery that there was a DVD out here by saying: Please see attached DVD. If they didn't see it, they could have done something about it four months ago.

(Tr. at 347-349.)

{¶ 25} The trial court suggested that it could declare a mistrial, and asked Ingram's counsel and appellant's counsel: "Do you feel that because of the absence of knowledge of this tape, * * * absent the knowledge of the DVD until yesterday late in the day, that your client[s] would be prejudiced by going forward with this case?" (Tr. at 350-351.) Both counsel stated that their clients would be so prejudiced. Specifically, appellant's counsel stated:

* * * It would definitely change my preparation of the case.I would have prepared differently. The discovery we initially received in the summary my client didn't make any statements. There was never any concern there. He made no statement.

The summary said the statement that Mr. Ingram made was just simply that he was there earlier, but didn't know anything about the shooting. That was it. There was nothing else.

So, based upon that knowledge is what we prepared. And I do believe that it would change my mind if they are going to introduce his statements against my witness.

(Tr. at 351-352.)

{¶ 26} The trial court then recessed to allow the co-defendants to talk with their respective counsel. Afterwards, the trial court readjourned. Appellant's counsel stated: "We have discussed the potential mistrial with our clients. We have discussed the upside and downside to that motion, and we have been instructed not to request a mistrial at this time." (Tr. at 354.)

{¶ 27} The trial court concluded that appellee could use appellant's pre-trial statements to impeach appellant's alibi. The trial court explained: "[T]here was sufficient notice to defense counsel that they could have been aware and could have raised the issue of the inadvertently, nonprovided DVD, and they failed to do that." (Tr. at 354.) Ingram's counsel stated: "Just note our objection." (Tr. at 354.)

{¶ 28} Appellee then formally rested its case-in-chief, and appellant's counsel called Tiffany Davis to testify. Davis testified as follows. Appellant and Davis had been dating, and appellant is the father of Davis' child. Davis sees appellant

13

and Ingram every day. Neither appellant nor Ingram had an afro on April 7, 2006.

{¶ 29} On April 7, 2006, Davis was visiting her aunt. She received a phone call indicating that appellant was "in the back of a police car" at the Two Friends store. (Tr. at 360.) Davis went to see appellant and arrived at the Two Friends store around 4:30 p.m. At that time, appellant was leaving. However, Ingram was present, and Davis stayed at the store with Ingram.

{¶30} Thereafter, Davis and Ingram went to appellant's house, and they arrived at appellant's mother's house around 6:30 p.m. At that time, appellant was leaving with his mother to go to a restaurant. However, Davis and Ingram went in the house and visited with appellant's grandmother.

{¶ 31} Appellant and his mother returned at 7:30 p.m. Davis, Ingram, and appellant then socialized. At one point, B.H. was present, but was mostly "in and out of the house." (Tr. at 364.) Ingram and Davis left around 11:00 p.m.

{¶ 32} Next, Davis testified as follows:

Q [Burney's counsel]. Did [appellant] or [Ingram] ever leave the house to the best of your knowledge?

A. No.

(Tr. at 364.)

{¶ 33} On cross-examination, Davis testified as follows. B .H. and appellant are half-siblings in that they have the same mother, but different fathers. Ingram and appellant are cousins. Appellant and Ingram are "always together." (Tr. at 368.) B.H. "hung out with [appellant and Ingram] a lot," but "[n]ot all the time." (Tr. at 368.)

{¶ 34} B.H. was at the Two Friends store when Davis arrived to see what was going on with appellant. Davis also testified on cross-examination that, to her knowledge, Ingram was with appellant at the Two Friends store when appellant had an altercation with a store clerk during the day on April 7, 2006, i.e., the incident that led the police to temporarily place appellant in a police cruiser.

{¶ 35} Next, Davis testified as follows on cross-examination:

14

Q. If [Ingram] said [appellant's] baby's mom, who was pregnant, she was in the store when [appellant] got into it with the store clerk, that wouldn't be true?

A. No.

\* \* \*

Q. If [Ingram] made a statement saying that, in fact, himself, [appellant] and [B.H.] were together the rest of that evening until 11:00 \* \* \*, that wouldn't be true?

A. No.

Q. You can't alibi for [B.H.] now, can you?

A. No.

Q. Even though [Ingram], if he made a statement saying he was with [B.H.] that whole night with [appellant] and you, that wouldn't be true?

\* \* \*

A. No.

(Tr. at 370-371, 373.)

{¶ 36} Davis also testified on cross-examination that she did not contact police to exonerate appellant, despite learning about appellant being arrested for shooting Anwar. Davis also stated that she did not want to see appellant incarcerated for "[n]othing he didn't do." (Tr. at 377.)

{¶ 37} On re-cross examination, Davis testified as follows:

Q. These brothers and cousins were all there at the first incident. You testified that if you saw [appellant], you saw [Ingram]. They were shadows. It is your testimony [Ingram] and [appellant] were with you, but [B.H.] just took off at some point.

A. Yes. (Tr. at 387.)

{¶ 38} On further cross-examination, Davis testified as follows:

Q. [B.H.] was not with you the whole night?

15

A. No.

Q. Was [Ingram]?

*8 A. Yes.

Q. If [Ingram] had said that [B.H.] was with him, that's true?

A. Yes.

Q. Just not the whole night?

A. No.

(Tr. at 389-390.)

{¶ 39} On redirect examination, Davis testified that she did not contact the police or the prosecution about the alibi because she did not believe they would listen to her. Davis reiterated that neither appellant nor Ingram could have been involved in the April 7, 2006 shooting incident because they were with her at the time.

{¶ 40} Neither Ingram nor appellant presented any further witnesses. On rebuttal, appellee re-called Columbus Police Detective Timothy Dorn to testify. Appellee reiterated that it called Detective Dorn to testify in order to impeach Davis' testimony. Both counsel for appellant and Ingram objected. The trial court overruled the objections and allowed the testimony.

{¶ 41} Detective Dorn then testified as follows. Detective Dorn interviewed Ingram after police arrested Ingram in relation to the April 6, 2007 shooting. Ingram waived his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, and agreed to talk with the detective. During Detective Dorn's testimony, appellee played parts of Ingram's video-recorded interview, and the recording was admitted into evidence as Exhibit 30. Again, appellant's counsel and Ingram's counsel objected to appellee showing Ingram's video-recorded interview, but the trial court overruled the objections.

{¶ 42} The recording depicted the following. Detective Dorn informed Ingram of his rights pursuant to *Miranda*. These rights include the right to remain silent and the right to an attorney. Ingram indicated that he understood his *Miranda* rights,

16

and Ingram expressly waived those rights verbally and by signing a waiver form. Ingram then answered Detective Dorn's questions. Ingram denied his or appellant's involvement in the April 7, 2006 shooting incident. Ingram also stated that he had no issues with any employee at the Two Friends store. However, Ingram indicated that appellant was involved in an earlier altercation with a store clerk at the Two Friends store after the clerk accused appellant of trying to grab money from the cash register. In that altercation, the store clerk and appellant fought each other with bats. In the recording, Ingram also refers to a "baby's momma" who was in the store at the time of that first altercation. (Appellee's Exhibit 30, interview of Ingram, recorded at 17:55:11-14.) Ingram then states the following in the recording. When police arrived in response to the first altercation, individuals with appellant explained to police that appellant was not trying to take money from the cash register. After the first altercation with the store clerk, appellant and Ingram went to appellant's house. Eventually, B.H. also came to the house, and B.H. remained at the house for some time. (Appellee's Exhibit 30, interview of appellant, recorded at 17:57:19-33.) Ingram provided no indication in the recording that B .H. was going in and out of the house throughout the evening.

{¶ 43} Afterwards, the parties made closing arguments and the trial court instructed the jury that closing arguments "are not evidence." (Tr. at 402.) During appellee's closing argument, it referred to Exhibit 30 as follows:

And [Davis'] testimony is refuted by that tape you just saw.

* * *
* * *

Look at State's Exhibit 30, and [Ingram's] statement regarding the baby's momma being in the store with him.

* * *

About that prior incident, there is no doubt [appellant] was the one that was in there earlier, and [Ingram] puts himself in there. * * *

I don't have to prove motive to you * * *. What more motive could there be?

This clerk called the police on all of them. Listen to State's 30. It happened.

* * * And motive goes to what is going on in their minds.

17

Why would they do this to this man?

Because he had the nerve to call the police on them. He had the nerve to try and defend his business and his property.

Why wouldn't they feel entitled to come back and do something like this. They have been doing it for months to the man, breaking out his windows, throwing things at his car.

[APPELLANT'S COUNSEL]: I would object. It is a mischaracterization of the evidence.

THE COURT: I would emphasize[ ] again that [appellee] is presenting to the jury his interpretation of the facts. And the jury is not bound by this interpretation.

The objection is overruled.

\* \* \*

\* \* \* Actually, Delshawn Jones, one of their friends, actually got arrested this time, not for what he had done to Mr. Anwar, but for having a gun. And that is what this is about.

They are angry about what happened earlier. They are angry their friend got arrested out of that incident. And I am going to show him whose neighborhood this really is. They have been doing this to him.

(Tr. at 431-434.) Appellant's counsel and Ingram's counsel argued separately during closing arguments that their clients were not involved in the shooting incident. In particular, appellant's counsel argued:

So, I guess the question is what made him say that Les and Ravon are the shooters?

There are a myriad of reasons. I can't even get to them all. There are many reasons.

Did he transpose the faces of Les and Ravon with someone that had a similar build? Did he think he saw them, or is he making certain assumptions?

Do you think he had seen them because he saw [B.H.], because in the past they

18

have been together in the store?

Did he associate [B.H.] with Les and Ravon? Did he expect that to happen?

Did he expect if he saw [B.H.], and he had got shot, that it had to be somebody else?

(Tr. at 449.)

{¶ 44} During jury instructions, the trial court instructed the jury:

Evidence was admitted of another act that [appellant] might have committed. You may not consider that evidence to determine whether the defendant committed any act alleged in the indictment.

 (Tr. at 409.)

{¶ 45} Ultimately, the jury found appellant not guilty of attempted murder, but guilty of felonious assault with the firearm specification. The trial court sentenced appellant accordingly.

*State v. Burney*, 2007 WL 4564306, *1-10.

### III.  THE STANDARD OF REVIEW

When, as here, the claims presented in a habeas corpus petition have been

presented to and decided by the state courts, a federal habeas court may not grant relief

unless the state court's decision was contrary to or an unreasonable application of

clearly established federal law, or based on an unreasonable determination of the facts

in light of the evidence that was presented.  28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an

19

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States District Court for the Western District of Michigan has summarized

this standard as follows:

[A] decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." [*Williams v. Taylor*, 529 U.S. 362 (2000)] at 413. A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. A federal habeas court may not find a state court's adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. Further, the federal habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id*.

*Williams v. Lavigne*, 2006 WL 2524220 (W.D. Michigan August 30, 2006).   The Court will

apply this standard to all of petitioner's claims except where it is specifically noted that

a different standard of review applies.

## A.  CLAIM ONE

Petitioner's first claim raises the issue of whether the admission of inculpatory

statements by his non-testifying codefendant, Mr. Ingram, constituted harmless error.

The Court of Appeals determined that the trial court's admission of Mr. Ingram's

statements violated petitioner's constitutional rights under the Sixth Amendment's Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36 (2004) and *Bruton v. United States*, 391 U.S. 123 (1968). The Court of Appeals went on to conclude, however, that the constitutional error was harmless. Here, petitioner contends that the admission of Mr. Ingram's statements was not harmless error because the statements both provided a motive for petitioner's alleged shooting and destroyed his alibi defense.

The state court addressed this claim in the following manner:

{¶ 47} In his first assignment of error, appellant argues that we must reverse his convictions because the trial court erroneously allowed appellee to use Ingram's pretrial statement to Detective Dorn. We disagree.

{¶ 48} Appellant first argues that the use of Ingram's statement at trial implicated *Bruton v. United States* (1968), 391 U.S. 123. In that case, Bruton and a co-defendant were tried for armed robbery in a joint trial. Bruton's co-defendant made an out-of-court statement indicating Bruton's involvement in the crime. The out-of-court statement was admitted into evidence at the joint trial. Because the co-defendant did not testify, Bruton could not attack that statement by cross-examination. Recognizing that the co-defendant's statement was inevitably suspect because of the motivation to shift the blame to Bruton, and that it was "devastating" to Bruton's defense, the United States Supreme Court held that Bruton's inability to attack the statement violated Bruton's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Bruton* at 124, 135-137. *See, also, State v. Moritz* (1980), 63 Ohio St.2d 150, paragraph one of the syllabus, following *Bruton* (recognizing that "[a]n accused's right of cross-examination secured by the confrontation clause of the Sixth Amendment is violated in a joint trial with a non-testifying codefendant by the admission of extrajudicial statements made by the codefendant inculpating the accused").

{¶ 49} Conversely, relying on *Richardson v. Marsh* (1987), 481 U.S. 200, appellee asserts that Ingram's statements did not implicate *Bruton*. Marsh involved a joint murder trial with Marsh and a co-defendant. *Id*. at 202. Another co-defendant was involved in the murder, but was a fugitive during the joint trial. *Id*. The prosecution used at trial a redacted pre-trial confession of the co-defendant being

21

tried with Marsh. *Id*. at 203. The redacted confession omitted all reference to Marsh, but inculpated Marsh's two co-defendants. *Id*. As redacted, the confession indicated that the co-defendants discussed the murder in the front seat of a car while they traveled to the victim's house. *Id*. at 203-204. The trial court also instructed the jury not to consider the confession against Marsh. *Id*. at 204-205. Later in the trial, however, Marsh testified to being in the car with the two co-defendants on the date of the murder. *Id*. at 204. Marsh heard the two co-defendants talking, but could not hear their conversation. *Id*.

{¶ 50} The United States Supreme Court held that the redacted confession did not implicate *Bruton*. *Marsh* at 208. The court noted that the statement in *Bruton* was "incriminating on its face," and had " 'expressly implicat[ed]' " *Bruton*. *Marsh* at 208, quoting *Bruton* at 124, fn. 1. By contrast, the court stated the redacted co-defendant's confession amounted to "evidence requiring linkage" in that it "became" incriminating in respect to Marsh "only when linked with evidence introduced later at trial." *Id*. The court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211.

{¶ 51} Appellee contends that, like *Marsh*, Ingram's statement did not implicate *Bruton* because Ingram's statements were not facially incriminating to appellant. Appellee notes that Ingram indicated in his statement that appellant was not involved in the April 7, 2006 shooting incident. Appellee also states that, to the extent that it used Ingram's statement to impeach appellant's alibi, Davis, the statement becomes incriminating only upon the jury linking the statement with other evidence, i.e., Davis' testimony, and "(1) find[ing] that the statements were inconsistent with Davis' alibi testimony, and (2) conclud[ing] that, as a result of the inconsistencies, Davis lacked credibility."

{¶ 52} Regardless, unlike *Marsh*, the parties did not redact from Ingram's statement all references to appellant, and portions of the statement "on its face" incriminated appellant. Specifically, Ingram stated expressly that appellant was involved in the altercation that occurred on April 7, 2006, between appellant and Anwar before the shooting. Thus, Ingram's statement provided direct proof of appellant and Ingram's motive for being involved in the shooting against Anwar, and the statement supported the argument appellee made during closing arguments on appellant's and Ingram's motive behind the shooting incident. *See State v. Curry* (1975), 43 Ohio St.2d 66, 70-71 (noting that motive is generally relevant in all criminal trials, even though the prosecution need not prove motive

in order to secure a conviction). Specifically, appellee argued that one motive behind the shooting incident was that Anwar called the police after the altercation with appellant that took place on April 7, 2006, before the shooting. In this regard, appellee implicated *Bruton* by using, at trial against appellant, Ingram's statement to Detective Dorn, and, in this regard, the trial court erred by admitting the statement into evidence.

{¶ 53} However, errors under *Bruton* are subject to harmless error review. *Harrington v. California* (1969), 395 U.S. 250, 252-254. Courts need not disturb convictions based on harmless error. *State v. Mardis* (1999), 134 Ohio App.3d 6, 22. In regards to constitutional errors, such as those under *Bruton*, courts determine whether the error was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 24. Stated another way, the appellate court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. *State v. Phipps*, Franklin App. No. 03AP-533, 2004-Ohio-3226, at ¶ 25. Thus, where evidence against the accused is " 'overwhelming,' " a reviewing court concludes beyond a reasonable doubt that the denial of an accused's constitutional rights was harmless error. *Harrington* at 254, quoting *Chapman* at 23; *Phipps* at ¶ 25. In doing so, the court does not consider the erroneous material. *Mardis* at 22.

{¶ 54} Here, even absent Ingram's statement to Detective Dorn, "overwhelming" evidence existed to prove beyond a reasonable doubt that appellant shot Anwar and, therefore, committed felonious assault as charged. In particular, Anwar testified that appellant was one of the shooters. We recognize that Officer Polta had claimed that Anwar initially identified B.H. as the individual who shot him, and we recognize the record contains other discrepancies on Anwar identifying appellant as a shooter. However, as noted below in appellant's fourth assignment of error, such discrepancies do not negate Anwar ultimately and unequivocally identifying appellant as one of his shooters. Moreover, we note that, even without Ingram's statements being admitted into evidence, Anwar's testimony supported appellee's argument concerning appellant's and Ingram's motive to shoot Anwar. Specifically, Anwar confirmed appellant's involvement in an altercation on April 7, 2006, that occurred before the shooting. In addition, Davis' testimony places appellant at the scene of this earlier altercation.

{¶ 55} Thus, appellant's case is akin to *Moritz*, where the Ohio Supreme Court declined to reverse a defendant's conviction merely upon *Bruton* error. *Moritz* at 156, 159. In upholding the conviction, the Ohio Supreme Court concluded that "there was more than sufficient independent evidence of [the defendant's] guilt to render admission of the contested statements harmless beyond a reasonable

doubt." Id. at 156. We similarly conclude that the trial court committed harmless error in regards to *Bruton* in admitting into evidence Ingram's pre-trial statement to Detective Dorn.

{¶ 56} Next, appellant argues that, when the trial court admitted into evidence Ingram's pre-trial statement to Detective Dorn, the trial court violated appellant's right to confrontation as guaranteed by the Sixth Amendment to the United States Constitution. The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The Sixth Amendment is made applicable to the states through the Fourteenth Amendment to the United States Constitution. *Pointer v. Texas* (1965), 380 U.S. 400, 403-406. In *Crawford v. Washington* (2004), 541 U.S. 36, 59, 68-69, the United States Supreme Court held that, to conform with a defendant's federal confrontation constitutional rights, the "testimonial" statements of witnesses absent from trial shall only be admitted into evidence against the defendant when the witness is unavailable to testify and when the defendant has had a prior opportunity to cross-examine the witness.

{¶ 57} The United States Supreme Court in *Crawford* expressly declined to "spell out a comprehensive definition of 'testimonial.' " *Id*. at 68. However, the United States Supreme Court held that the term "testimonial" covers, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*. Likewise, the United States Supreme Court gave three examples of "formulations" for " 'testimonial' statements" that historical analysis supports. *Crawford* at 51-52; *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, at ¶ 19. The first deems testimonial all " ' ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' " *Crawford* at 51, quoting petitioner's brief; *Stahl* at ¶ 19. The second includes all " 'extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' " *Crawford* at 51-52, quoting *White v. Illinois* (1992), 502 U.S. 346, 365; *Stahl* at ¶ 19. The third includes " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Crawford* at 52, quoting amici curiae brief; *Stahl* at ¶ 19.

{¶ 58} "In determining whether a statement is testimonial for Confrontational Clause purposes, courts should focus on the expectation of the declarant at the

24

time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *Stahl*, paragraph two of the syllabus. Moreover, courts should view a declarant's statements objectively when determining whether the statements implicate Confrontation Clause protection pursuant to *Crawford. Stahl* at ¶ 22.

{¶ 59} Here, Ingram spoke with Detective Dorn during a police interrogation, and Ingram's statements to Detective Dorn constitute testimonial statements under *Crawford. Id.* at 68. Yet, relying on *State v. Lewis*, Hamilton App. No. C-050989, 2007-Ohio-1485, appellee argues that its use of Ingram's statement at trial did not implicate *Crawford* because it did not use the statement for its truth, but, rather, only used the statement to impeach appellant's alibi. Likewise, relying on *State v. Nia*, Cuyahoga App. No. 87335, 2007-Ohio-1283, appellee argues that its use of Ingram's statement did not implicate *Crawford* because the statement was not incriminating to appellant. However, we reject such contentions given, as noted above, Ingram's statement did incriminate appellant by demonstrating appellant's motive to shoot Anwar, and appellee offered Ingram's statement for the truth of the matter asserted, i.e., to demonstrate that motive.

{¶ 60} Thus, the trial court's admission at trial of Ingram's testimonial statement violated *Crawford* and the Sixth Amendment right to confrontation because appellant had no prior opportunity to cross-examine Ingram about the statement. However, Sixth Amendment violations under *Crawford* are subject to harmless error review. *State v. Lee*, 162 Ohio App.3d 648, 2005-Ohio-3395, at ¶ 11. For the reasons noted above, we conclude that the trial court committed harmless error in regards to *Crawford* in admitting into evidence Ingram's pre-trial statement to Detective Dorn.

{¶ 61} Lastly, appellant argues that, when the trial court admitted into evidence Ingram's pre-trial statement to Detective Dorn, the trial court violated appellant's right to confrontation as guaranteed by Section 10, Article I of the Ohio Constitution, which states: "In any trial, in any court, the party accused shall be allowed to * * * meet the witnesses face to face." In *State v. Storch*, 66 Ohio St.3d 280, 293, 1993-Ohio-38, the Ohio Supreme Court stated: "We construe the right to confrontation contained in Section 10, Article I to require live testimony where reasonably possible." However, a violation of Ohio's Confrontation Clause is subject to harmless error review. *See State v. Jones*, Lucas App. No. L-00-1231, 2003-Ohio-219, at ¶ 58-60. Thus, for the reasons noted above, to the extent that the trial court violated Section 10, Article I of the Ohio Constitution when it admitted into evidence Ingram's pre-trial statement to Detective Dorn, we find

such error harmless.

{¶ 62} Accordingly, based on the above, we overrule appellant's first assignment of error.

*State v. Burney*, 2007 WL 4564306, *10-14.

Petitioner contends that the error was not harmless for two primary reasons. First, the admission of Mr. Ingram's statement provided motive by suggesting that petitioner was upset over a prior incident at the store and came back to shoot the victim. Second, Mr. Ingram's statement destroyed the alibi defense provided by Ms. Davis. Petitioner argues that Mr. Ingram's statement was important to the prosecution's case because there was little physical evidence identifying him as one of the shooters and the eyewitness' identification was unreliable. Respondent contends that, to the extent that any constitutional error was involved in the admission of Mr. Ingram's statement, the error was harmless. Given this framing of the issue, the Court will address only the issue of harmless error.

On collateral review, an error is deemed harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) *quoting Kotteakos v. United States*, 328 U.S. 750, 768 (1946). Stated another way, a finding that the error was harmless depends on "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Madrigal v. Bagley*, 413 F.3d 548, 551 (6th Cir. 2005). If the issue is "evenly balanced" such that the Court has "grave doubt" as to the error's harmlessness,

it "should treat the error, not as if it were harmless, but as if it affected the verdict." *O'Neal v. McAninch*, 513 U.S. 432 (1995). This standard applies even when the state court has recognized the claim and itself applied the harmless error analysis set out in *Chapman v. California*, 386 U.S. 18 (1967). *See Fry v. Pliler*, 551 U.S. 112 (2007); *Vasquez v. Jones*, 496 U.S. 564 (6th Cir. 2007).

Under *Brecht*, whether an error was harmless depends upon a number of factors including "(1) the importance of the witness' testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Mr. Ingram's statement was not part of the prosecution's case in chief but was used for impeachment purposes to rebut the testimony of Ms. Davis, petitioner's alibi witness. Under this circumstance, Mr. Ingram's statement was not of significant importance to the prosecution's case. Instead, the primary focus of the prosecution's case was the victim's eyewitness testimony. Despite petitioner's position to the contrary, the victim's identification of petitioner from a photo array was unequivocal. (Tr. 284-285; 134-135). To the extent that the state court found objectionable Mr. Ingram's statement about petitioner's involvement in a previous incident, the statement was cumulative of other evidence introduced. For example, the victim, Mr. Anwar, had testified about petitioner's involvement in the earlier incident. (Tr. 112-114).

27

Further, petitioner's alibi witness had confirmed petitioner's involvement in the earlier incident. (Tr. 360-362). Thus, the testimony of both the victim and the alibi witness corroborated Mr. Ingram's statement regarding petitioner's involvement in the earlier incident. Additionally, while petitioner claims that Mr. Ingram's statements negated his alibi, the credibility of his alibi witness was called into question on cross-examination by the prosecution on issues wholly unrelated to Mr. Ingram's statement. (Tr. 375-377). In short, the erroneously admitted statement did not provide the only evidence of petitioner's involvement in a previous incident nor did it call into question a steadfast alibi. For these reasons, the Court cannot conclude that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht* at 623.

### B.  <u>CLAIM TWO</u>

Petitioner's second claim is that his trial counsel performed ineffectively by failing to object to inadmissible, irrelevant testimonial evidence which allowed the prosecution to contend that petitioner  committed prior malicious acts against the victim. According to petitioner, this evidence was used by the prosecution to demonstrate that he had a personal vendetta against the victim.  Respondent argues that trial counsel's failure to object to the pre-shooting incidents was part of trial strategy.  Further, respondent argues that counsel used the testimony to demonstrate that the victim, Mr. Anwar was predisposed to believe that petitioner and his co-defendant were the shooters.

The right to counsel guaranteed by the Sixth Amendment is the right to the

effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The

standard for demonstrating a claim of ineffective assistance of counsel is composed of

two parts:

> First, the defendant must show that counsel's performance
> was deficient. This requires showing that counsel made errors
> so serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second,
>  the defendant must show that deficient performance
> prejudiced the defense. This requires showing that counsel's
>  errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's

performance must be "highly deferential." *Id*. at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties

inherent in making the evaluation, a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance." *Id* .

To establish the second prong of the *Strickland* test, prejudice, a petitioner must

demonstrate that there is a reasonable probability that, but for counsel's errors, the

result of the proceedings would have been different. *Id*. at 694. "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate

ineffective assistance of counsel, should the court determine that petitioner has failed to

satisfy one prong, it need not consider the other. *Id.* at 697.

The state court of appeals ruled on this claim as follows:

{62} ***  In his second assignment of error, appellant argues that his counsel rendered ineffective assistance. We disagree.

{¶ 63} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. *Strickland v. Washington* (1984), 466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. *Id*. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Id*. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

{¶ 64} A properly licensed attorney is presumed competent. *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, at ¶ 88, citing *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 301. Moreover, there is " 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, quoting *Strickland* at 689. In matters regarding trial strategy, we will generally defer to defense counsel's judgment. *State v. Carter*, 72 Ohio St.3d 545, 558, 1995-Ohio-104; *see, also*, *State v. Carpenter* (1996), 116 Ohio App.3d 615, 626, citing *Bradley* at 144 (holding that we are to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance"). We will only reverse on trial strategy grounds if defense counsel's trial strategy deviated from the standard of reasonableness. *State v. Burgins* (1988), 44 Ohio App.3d 158, 160; *State v. Newsome*, Ashtabula App. No.2003-A-0076, 2005-Ohio-3775, at ¶ 8.

{¶ 65} Appellant argues that his counsel was ineffective for not objecting to: (1) appellee alleging in opening argument, and presenting evidence during trial, that a third party threatened to shoot Anwar during the altercation with Anwar and appellant before the shooting; (2) appellee alleging in opening argument that Anwar called the police for unidentified individuals throwing rocks at his business; (3) Anwar testifying that, during the altercation with Anwar and appellant before the shooting, a person with appellant threatened to shoot Anwar; (4) Anwar testifying that unidentified persons previously threw rocks at the Two Friends store and broke windshields of vehicles owned by Anwar and by the Two Friends store owner's girlfriend; and (5) Officer Polta testifying that he believed B.H. was responsible for smashing the truck window earlier on the day of the shooting. Appellant argues that the above evidence was inadmissible

30

under: (1) Evid.R. 802 as hearsay; (2) Evid.R. 402 and 404(B) as irrelevant and improper other-acts evidence; and (3) Evid.R. 403(A) as prejudicial.

{¶ 66} Generally, counsel's failure to make objections is within the realm of trial tactics. *State v. McCroskey* (Apr. 2, 1997), Wayne App. No. 96CA0026. Thus, the failure to object, without more, is insufficient to sustain a claim of ineffective assistance of counsel. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, at ¶ 168.

{¶ 67} Here, the record establishes that appellant's counsel made a tactical decision not to object to the above. In particular, as his opening and closing statements indicate, appellant's counsel sought to establish that Anwar accused appellant and Ingram of shooting him, not because he saw them do so, but because the problems he had at the Two Friends store improperly predisposed him into believing that Ingram and appellant were the shooters. Moreover, it was within the realm of trial tactics for appellant's counsel not to object to evidence concerning B.H. breaking the truck windshield because Officer Polta had testified that Anwar initially identified as one of his shooters the individual who broke the truck windshield, i.e., B.H. Indeed, as noted below, on appeal, appellant relies on similar defenses from the other-acts evidence concerning B.H. to argue that his conviction is against the manifest weight of the evidence. Given such available defenses from the other-acts evidence, we find that appellant's counsel did not deviate from a standard of reasonableness in deciding not to object to the other-acts evidence or to appellee referencing the other-acts evidence.

{¶ 68} In so concluding, we note that, appellant argues that during closing arguments, appellee tried to impugn appellant and Ingram with this other-acts evidence. However, appellant's counsel did object to appellee construing the evidence in such a manner. To the extent that appellant argues that the other-acts evidence nonetheless allowed the jury to find that appellant had a propensity to commit other crimes, we note that the trial court instructed the jury otherwise. And, we presume that jurors follow the trial court's instructions. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 39.

{¶ 69} In the final analysis, we conclude that it was within the realm of reasonable trial tactics for appellant's counsel not to object to the other-acts evidence and not to object to appellee's reference to the other-acts evidence. Therefore, we conclude that appellant's counsel did not render ineffective assistance by failing to object to the above, and we overrule appellant's second assignment of error.

The Court of Appeals' application of *Strickland* was not unreasonable.  Petitioner has not shown that trial counsel's failure to object was anything other than reasonable strategic decision-making.   Counsel's failure to object was consistent with the theory of the case as outlined in his opening and closing statements – that Mr. Anwar was predisposed to believing that petitioner was one of the shooters because of  prior events.  Consequently, the Court concludes that petitioner has not shown a likelihood that counsel's objections would have changed the outcome of the proceeding.

### III.  CLAIM THREE

Petitioner's third claim alleges prosecutorial misconduct during closing argument.  Specifically, petitioner asserts that the prosecutor led the jury to believe that petitioner had "terrorized" Mr. Anwar over a period of months.  Petitioner argues that the prosecutor's statements mischaracterized the evidence and were significant to the verdict given the overall weakness of the prosecution's case.

The state court of appeals ruled on this issue in this way:

{¶ 70} In his third assignment of error, appellant contends that he was denied a fair trial because of prosecutorial misconduct. We disagree.

{¶ 71} Appellant argues that appellee improperly made the following statements without evidentiary support during closing argument:

Why would they do this to this man?

* * *

Why wouldn't they feel entitled to come back and do something like this. They have been doing it for months to the man, breaking out his windows, throwing things at his car.

32

(Tr. at 433.) Appellant notes that the record did not establish that appellant and Ingram were "breaking out [Anwar's] windows" or "throwing things at his car." Indeed, at trial, appellant's counsel objected to the above statement as a mischaracterization of the evidence.

{¶ 72} Courts afford prosecutors wide latitude in making closing arguments. *State v. Benge*, 75 Ohio St.3d 136, 141, 1996-Ohio-227. However, "[i]t is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." *State v. Smith* (1984), 14 Ohio St.3d 13, 14. Ultimately, whether the prosecutor's remarks constitute misconduct requires analysis as to: (1) whether the remarks were improper; and (2) if so, whether the remarks prejudicially affected a defendant's substantial rights. *Noling* at ¶ 91.

{¶ 73} Here, after appellee made these comments, the trial court instructed the jury that appellee was only "presenting to the jury [its] interpretation of the facts" and that "the jury [was] not bound by this interpretation." (Tr. at 433.) Likewise, before the parties presented closing arguments, the trial court instructed the jury that closing arguments were not evidence. We also reiterate that, to the extent that appellant argues that the other-acts evidence nonetheless allowed the jury to find that appellant had a propensity to commit other crimes, the trial court instructed the jury otherwise. In recognizing these instructions, we presume that the jury follows a court's instructions. *Noling* at ¶ 39; *see, also*, *State v. Trewartha*, Franklin App. No. 05AP-513, 2006-Ohio-5040, at ¶ 21 (finding no prosecutorial misconduct because, in part, the trial court instructed the jury that counsel's closing arguments "were not evidence, but the opinion and observations of counsel"). Thus, we conclude that the trial court's instructions eliminated any prejudicial effects from appellee's counsel's comments.

{¶ 74} Accordingly, we hold that the prosecutor's comments did not prejudicially affect appellant's substantial rights and, therefore, did not rise to the level of prosecutorial misconduct. Therefore, we overrule appellant's third assignment of error.

*State v. Burney*, 2007 WL 4564306, *14-16.

As this Court explained in *Sowell v. Collins*, 557 F.Supp. 2d 843, 911 (S.D. Ohio 2008),

The appropriate standard of review for claims of prosecutorial misconduct on a writ of habeas corpus is "the narrow one of due process,

and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). For prosecutorial misconduct to rise to the level of a constitutional violation, the conduct of the prosecutor must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir.2006) (quoting *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868); *see also Darden*, 477 U.S. at 181, 106 S.Ct. 2464. Thus, "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir.2000).

When analyzing a claim of prosecutorial misconduct, a federal court must first determine whether the challenged statements were improper. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir.2000). If improper, the court must examine whether the statements were so flagrant as to constitute a denial of due process and warrant the granting of a writ. Even if the prosecution's conduct was improper, or even "universally condemned," a federal court can only reverse a conviction or sentence if the statements were so flagrant as to render the entire trial fundamentally unfair. *See e.g., Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir.2006). A court makes that determination by considering the following four factors:  (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.  *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.2005); *see also Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir.2003). Relief will not be granted unless the conduct of the prosecutor "likely had a bearing on the outcome of the trial...." *Byrd,* 209 F.3d at 530.

Having reviewed the transcript, and noting the limiting instruction given

by the trial court, the Court does not believe that, to the extent they could be

considered improper,  there is much likelihood that the prosecutor's remarks

misled the jury or prejudiced the defendant.  The remarks at issue were limited

to a brief portion of the  closing argument and the trial judge quickly informed

the jury that such statements simply were the prosecutor's interpretation of the

facts.   Further, the strength of the evidence against petitioner was such that the prosecutor's statements cannot be considered significant viewing the record as a whole.   Again, the Court is not persuaded by petitioner's argument that the eyewitness identification provided by Mr. Anwar was unreliable.  Given this, the Court does not believe that the conduct of the prosecutor in making these statements had any bearing on the outcome of the trial.  Consequently, the Court does not find unreasonable the conclusion of the Court of Appeals that the prosecutor's comments "did not did not prejudicially affect appellant's substantial rights and, therefore, did not rise to the level of prosecutorial misconduct. "

## IV.  RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## V.  PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or

35

modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge